# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

DANIEL SIMPSON,

     Plaintiff,

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT,

     Defendant.

Case No. 2:10-CV-00393-KJD-RJJ

**ORDER**

Before the Court is Las Vegas Metropolitan Police Department's Motion for Summary

Judgment (#30).  Plaintiff has filed an opposition (#33) and Defendant has filed a reply (#35).

I.  Background

Plaintiff, an African-American male, was terminated from his job as a corrections officer with

the Las Vegas Metropolitan Police Department ("LVMPD").  Plaintiff claims that his termination

was a result of racial discrimination and disparate treatment in violation of 42 U.S.C. § 1981.

Plaintiff worked at the Clark County Detention Center ("CCDC") in a module that held

inmates in cells, as well as in cots in a dayroom section.  Corrections officers are responsible for

making records of activities of officers and inmates using a computer system known as ITAG.

Officers use a unique login to the ITAG system and can either select routine activities from a drop-

down menu or manually enter notations to create the reports.  The reports created by ITAG are considered official LVMPD records.  One of Plaintiff's important responsibilities was a half-hourly "walk-through" of the module to check the welfare of the inmates and the structural integrity of the facility.  Plaintiff was required to record each walk-through in ITAG.

A.  Investigation

On April 2, 2009, an inmate in Plaintiff's module was attacked by a fellow inmate.  The victim approached the module office where Plaintiff was working and requested medical attention. Plaintiff did not immediately summon a nurse because he did not see Plaintiff's injuries.  Eventually, it became apparent that the inmate had been injured seriously and he received medical care.  The Office of Internal Affairs ("OIA") investigated the incident.  Plaintiff told OIA investigators that he did not want to enter the dayroom without his partner Officer Paul Lizondo and that he did not want to deal with the situation at the time because he had been misinformed that his girlfriend's father had died and was emotionally distraught.  Later, it was discovered that Plaintiff's girlfriend's cousin, not her father, had passed away.

B.  April 1, 2009 Entries

As part of its investigation, OIA retrieved video footage and the ITAG records of Plaintiff's shift.  The video footage does not match the ITAG entries.  The ITAG entries under Plaintiff's login show 14 walk-throughs and one security check.  However, the video footage only shows two of these activities.  The ITAG report contains a manually entered note stating "structure check complete... all structures secure... ." No structure check took place.  When Plaintiff was asked by investigators if he made this entry, he responded that he "probably did" and "as far as I can remember, I did."  (LVMPD (Simpson) 0163.)  Plaintiff readily admitted to OIA investigators he did not do any of the activities listed in the ITAG log because he was emotionally distraught.  (LVMPD (Simpson) 0158.)  Plaintiff was upset that he had not been allowed to go home and admitted that he knew his supervisor checked the ITAG logs.  Plaintiff claimed that he "was trying to make everything perfect, even though it

2

1  wasn't perfect." (LVMPD (Simpson) 0159.)   At his deposition, Plaintiff denied making false ITAG
2  entries.

3      C.  March 30-31, 2009 Entries

4      In its investigation of the events of April 1, OIA reviewed ITAG data and video footage from
5  Plaintiff's previous shift.  OIA identified 12 discrepancies between ITAG entries under Plaintiff's
6  login and surveillance video of the unit on the March 30-31 shift.  When questioned about ITAG
7  entries showing walk-throughs not reflected on the video, Plaintiff noted that other officers may have
8  entered up to half of them.  Plaintiff did not state that all ITAG entries made by him were accurate.
9  Instead, he speculated that some of the walk-throughs he may have entered could have been
10  interrupted prior to completion but that "maybe two, honestly I probably didn't do."  LVMPD
11  (Simpson) 0281.)

12      D.  UMC Incident

13      On July 22-23, 2009 Plaintiff was assigned to a detention room at University Medical Center
14  ("UMC").  The detention room held three detainees and was separated from the hallway by an
15  exterior door and a "cage-style" detention door.  LVMPD procedures require that the cage door
16  remain closed and locked at all times, except when it is used to enter or exit the room.  A buzzer and
17  video monitor serve to notify the officers inside the detention room so they can grant access from the
18  hallway.

19      On his July 22-23, 2009 shift at UMC, Plaintiff left the detention room for a break.  Plaintiff
20  used a chair to prop open the outer door as he and another officer left, leaving the detention room
21  open to the hallway. When questioned by OIA investigators, Plaintiff claims that he breached
22  protocol by propping the door open because the buzzer was broken. According to Plaintiff, when he
23  reported to the detention room, he gained admittance by knocking on the door because the buzzer
24  was not working properly. Plaintiff did not report problems with the buzzer at the time.

25      Contrary to Plaintiff's statements, the officer who admitted Plaintiff to the detention room on
26  that night told investigators that he admitted Plaintiff to the detention room for his shift when he

1    observed Plaintiff on the video monitor.  According to the officer, Plaintiff used the buzzer, and did

2    not knock.  Another officer on duty with Plaintiff that night, James Jackson, said that he experienced

3    no problems with the buzzer.  Officer Jackson also said that when he questioned Plaintiff about

4    propping open the detention room door, allowing full access to the hallway, Plaintiff stated

5    something to the effect of "F**k it, nurses ain't gonna say sh*t."  Officer Jackson also noted that

6    Plaintiff had a key to the door.  A work order dated a week after the shift in question indicates repairs

7    to the door's hinges, but does not indicate any issues with the buzzer.

8            E.  Statements at Pre-Termination Hearing

9            On February 18, 2010, Plaintiff appeared at a hearing before a three-member pre-termination

10   board (the "Board").  At the hearing, Plaintiff was questioned about his decision to leave detainees

11   alone in an unsecured room at UMC.  Plaintiff earlier told the OIA that the detainees were two-

12   pointed – a reference to a method of restraining detainees in their hospital beds – when he left the

13   room.  At the termination hearing Plaintiff claimed that he "four-pointed" all of the detainees prior to

14   leaving the room.  Upon being questioned by the Board, Plaintiff claimed that the detainees were

15   already four-pointed when he arrived.  After further questioning, Plaintiff again claimed to have four-

16   pointed the detainees.  (LVMPD (Simpson) 0527-0530.)

17          The Board found that Plaintiff was untruthful in his ITAG entries, was neglectful in his

18   duties, and untruthful in his testimony to the Board.  The Board unanimously recommended to the

19   Sheriff that Plaintiff be terminated.  The Sheriff agreed with the recommendation and terminated

20   Plaintiff on February 23, 2010.

21          F.  Arbitration

22          Plaintiff and LVMPD participated in binding labor arbitration on June 3, 2010, pursuant to

23   the parties' collective bargaining agreement.  Mr. Thomas Levak, a neutral arbitrator, presided over

24   the hearings and heard evidence and argument from both parties.  After considering the evidence, the

25   arbitrator determined that LVMPD had shown by clear and convincing evidence that it had cause to

26   terminate Plaintiff, that Plaintiff feigned emotional distress as an excuse to justify his failure to

4

1    perform walk-throughs, and that he was untruthful and neglectful in his duties.  The arbitrator also

2    rejected Plaintiff's arguments that his partner Officer Elizondo was treated differently.  The arbitrator

3    noted that testimony from Captain Curtis Williams showed that Elizondo was able to provide a

4    legitimate explanation for his conduct.

5         Plaintiff filed his Complaint (#1) on March 22, 2010 alleging racial discrimination and

6    disparate treatment in violation of 42 U.S.C. § 1981.

7    II. Discussion

8         A.  Legal Standard for Summary Judgment

9         Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

10   and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

11   material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ.

12   P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the

13   initial burden of showing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at

14   323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a

15   genuine factual issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

16   587 (1986); Fed. R. Civ. P. 56(e).

17        All justifiable inferences must be viewed in the light must favorable to the nonmoving party.

18   See Matsushita, 475 U.S. at 587.  However, the nonmoving party may not rest upon the mere

19   allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit

20   or other evidentiary materials provided by Rule 56(c), showing there is a genuine issue for trial.  See

21   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court need only resolve factual

22   issues of controversy in favor of the non-moving party where the facts specifically averred by that

23   party contradict facts specifically averred by the movant.  See Lujan v. Nat'l Wildlife Fed'n, 497

24   U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345

25   (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine

26   issue of fact to defeat summary judgment).  "[U]ncorroborated and self-serving testimony," without

1  more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v.

2  Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

3       Summary judgment shall be entered "against a party who fails to make a showing sufficient

4  to establish the existence of an element essential to that party's case, and on which that party will

5  bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Summary judgment shall not be granted

6  if a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248.

7       B.  Racial discrimination and disparate treatment in violation of 42 U.S.C. § 1981

8       The Civil Rights Act of 1866 provides, "All persons within the jurisdiction of the United

9  States shall have the same right in every State and Territory to make and enforce contracts . . . as is

10  enjoyed by white citizens."  42 U.S.C. § 1981(a).  The Civil Rights Act of 1991 later defined the

11  phrase "to make and enforce contracts" to include "the making, performance, modification, and

12  termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

13  contractual relationship."  Id. § 1981(b).  To prevail on a § 1981 claim a plaintiff must show:  (1)

14  intent to discriminate based on race; and, (2) this discrimination interfered with the making and

15  enforcing of contracts.  See Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303, 1313 (9th Cir.

16  1992) ("Proof of intent to discriminate is necessary to establish a violation of section 1981.");  Woods

17  v. Graphic Communications, 925 F.2d 1195, 1202-03 (9th Cir. 1991).  A plaintiff may prove a

18  defendant's intent to racially discriminate under § 1981 by fulfilling the familiar test outlined in

19  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  See Magana v. Commw. of

20  the N. Mar. I., 107 F.3d 1436, 1447 (9th Cir. 1997).

21       Under McDonnel Douglas, plaintiffs must first establish a prima facie case of employment

22  discrimination. Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir.2007). If plaintiffs establish a

23  prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to

24  articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of

25  Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123–24 (9th Cir.2000).  Once the legitimate non-

26  discriminatory explanation is offered, the plaintiff must raise a triable issue of material fact as to

6

whether the employer's proffered reason is pretextual and that race actually motivated the action. Noyes, 488 F.3d at 1168; see also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir.2000) (plaintiffs must "introduce evidence sufficient to raise a genuine issue of material fact" as to pretext).

### 1.  Prima Facia Case of Racial Discrimination

To establish a prima facie case, the Plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position or performing his job satisfactorily; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably.  See Chuang 225 F.3d at 1123. (citing McDonnell Douglas, 411 U.S. at 802). Failure to allege "specific facts" sufficient to establish the existence of a prima facie case renders a grant of summary judgment appropriate.  Palmer v. United States, 794 F.2d 534, 536-39 (9th Cir.1986).  When an employee is terminated for violating a strict employment policy, courts are not in a position to question the whether rigid adherence to the employment policy is wise, so long as failure to adhere the policy truly was the reason for the termination.  See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir.1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997)).[1]

LVMPD has an employment policy entitled "Truthfulness Required at All Times" (the "Truthfulness Policy.")  The Policy states that "failure to be truthful in any manner ... is unacceptable behavior and will not be tolerated" and "members formally noticed of official investigations conducted by the department who are found to be willfully and knowingly untruthful during the investigations, or who are found to be willfully and knowingly untruthful in completing official department documents, will be subject to termination."  (LVMPD (Simpson) 0419.)  ITAG entries are considered to be LVMPD official documents.  The LVMPD's Discipline Decision Guide in its Handbook for Managers and Supervisors mandates termination for the first violation of the Truthfulness Policy.

---

[1]  There is no dispute that Plaintiff is a member of a protected class and that his termination constituted adverse employment action.

1    LVMPD argues that ample undisputed evidence exists that Plaintiff was not performing his

2    job in a satisfactory way and that he violated LVMPD's Truthfulness Policy by making false ITAG

3    entries and being untruthful during the OIA investigation and the pre-termination hearing.

4    Specifically, LVMPD notes that Plaintiff admits that he did not perform required walk-throughs on

5    his April 1 shift.  The ITAG entries for that shift, which were made using Plaintiff's login and which

6    Plaintiff stated that he "assumed" he made, record 14 walk-throughs.  The manually entered notation

7    on one ITAG entry states "structure check complete...all structures secure..." even though no

8    structure security check took place.  Plaintiff acknowledged to the OIA that he "probably" made this

9    entry.  When asked by OIA officers about why ITAG entries were made if the actions they reflect did

10   not take place, Plaintiff stated that he knew his supervisor was inclined to check his ITAG entries

11   and so he "tried to make everything perfect, even though it wasn't perfect."  Plaintiff attempted to

12   explain his behavior by claiming emotional distress based on being mistakenly told that day that his

13   girlfriend's father had passed away.

14       On Plaintiff's March 31 shift, which was prior to being misinformed about the death, the

15   ITAG entries made under Plaintiff's login also reflect walkthroughs and other activities that did not

16   take place.  Plaintiff admitted that he "probably" made some of these ITAG entries.  When asked

17   about discrepancies between surveillance videos and the ITAG entries recording walk-throughs

18   Plaintiff said some walk-throughs may have been interrupted and that "maybe two, honestly I

19   probably just didn't do."  Plaintiff now claims that he never made any false ITAG entries.

20       Plaintiff admits that while at UMC, he propped the door to the detention room open, giving

21   full access from the hallway, and that he left detainees unattended.  Plaintiff acknowledges that this

22   was wrong.  When questioned, he explained his actions by telling investigators that the buzzer was

23   not working and noted that he had to knock on the door to gain entry to the detention room at the

24   start of his shift.  Other officers directly contradicted Plaintiff's statements and Plaintiff did not

25   report any problems with the buzzer on that day.  Plaintiff repeatedly contradicted himself to the OIA

26   and the pre-termination Board regarding how and when the detainees were restrained.  The Board

1   and a neutral arbitrator determined that Plaintiff neglected his duties, mislead investigators, and

2   falsified ITAG entries.

3          The specific facts offered by Plaintiff to make his required showing that he was performing

4   his job satisfactorily are evaluations from over a year before the incidents at issue here and two

5   commendations from his file.  The most recent commendation Plaintiff offers is for participating in a

6   civic function in March 2009.  Plaintiff claims that failure to perform walkthroughs on two occasions

7   was a minor infraction and that he has taken responsibility for neglecting his duties at UMC.

8   Plaintiff now denies making false ITAG entries, and argues that there is no way to prove that

9   Plaintiff, not another officer, made the entries under his login name.

10         Plaintiff does not show that he was excused from performing his duties.  He has admitted that

11  he is "probably" responsible for some of the false ITAG entries and notations made under his login.

12  He offers nothing but speculative and self-serving testimony to show that the false ITAG entries were

13  actually made by other officers on the shifts in question.  The record of the OIA investigation and the

14  pre-termination Board proceeding show multiple instances where Plaintiff made contradictory and

15  untruthful statements.  LVMPD's Truthfulness Policy leaves no room for misleading and false

16  conduct and provides for termination on the first violation of the Policy.  Undisputed facts show that

17  Plaintiff  was performing his job unsatisfactorily.  Accordingly, Plaintiff fails to make the required

18  showing of a prima facia case of employment discrimination and summary judgment is appropriate.

19                     2. Legitimate Non-Discriminatory Reason for Termination and Pretext

20         Even if Plaintiff had proved his prima facia case, LVMPD has articulated a legitimate non-

21  discriminatory reason for the adverse employment action.  Specifically, LVMPD asserts that it

22  terminated Plaintiff for violation of its Truthfulness Policy in accordance with its employment

23  procedures and that the reason for the termination was legitimate and non-discriminatory.  Because

24  LVMPD has met its burden to articulate a legitimate reason for Plaintiff's termination, Plaintiff is

25  required to introduce evidence sufficient to raise a genuine issue of material fact as to pretextual.

26  See Coleman 232 F.3d at 1282.

Plaintiff argues that the proffered reason for Plaintiff's termination is pretextual because similarity situated white officers were treated differently.  Officer Elizondo was also investigated by the OIA and recommended for termination.  However, the pre-termination Board examined evidence that Officer Elizaondo presented at his hearing and determined that there was not clear evidence that he was untruthful in making his ITAG entries.  The evidence exonerating Officer Elizadono had not been presented to OIA previous to that hearing and his statements had not been contradictory.

Officer David Knight, was also recommended for termination for inconsistencies between observed walk-throughs and entries in ITAG.  Officer Knight, unlike Plaintiff, was assigned to an "open bay" module where the entire module is visible from the officer's desk.  Mirrors are mounted in the module to provide additional viewing angles.  Video footage shows Officer Knight standing at his desk and observing the module.  The Board determined that this was a "poor effort" at walk-throughs by Officer Knight and agreed that Officer Knight was neglectful in his duties.  However, the Board determined that there was not clear evidence that Officer Knight was untruthful since the policy of what constitutes a walk-through in an open bay module was not clear. These situations stand in contrast to Plaintiff who admitted that he did not perform walk-throughs, gave contradicting statements to the OIA and the pre-termination Board about events at UMC, and stated that he "probably" made the ITAG entries at issue.  Undisputed facts show that Plaintiff was not similarly situated to Officers Elizaondo and Knight.  Accordingly, Plaintiff has failed to raise an issue of material fact about whether the LVMPD's explanation for his termination was pretextual.

III.  Conclusion

      **IT IS HEREBY ORDERED THAT** Las Vegas Metropolitan Police Department's Motion for Summary Judgment (#30) is **GRANTED**.

      DATED this 10th day of February 2012.


_____
Kent J. Dawson
United States District Judge